UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Case No. 1:23-cr-137-16 (CRC) |
| | : | |
| **TIMOTHY CONRAD,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing as to Defendant Timothy Conrad (hereafter, the "Defendant").[1]  For the reasons set forth below, the United States respectfully requests that the Court impose a sentence of 168 months of incarceration, to be followed by 60 months of supervised release.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

Over the course of approximately eighteen months, the Defendant and his co-conspirators engaged in a scheme to rob multiple South Asian jewelry stores, across multiple states, of heavy gold jewelry.  This carefully coordinated conspiracy began in January 2022 and continued until August 2023, ending only when several of the co-conspirators, including the Defendant, were charged and arrested.  Before they were apprehended, however, the co-conspirators robbed at least ten jewelry stores of millions of dollars in jewelry, terrorizing multiple victims and leaving behind a wake of destruction and financial loss.

Each of the robberies was carefully coordinated in advance of its commission and employed a similar *modus operandi*, one that the co-conspirators seemed to hone and perfect over

---

[1] Sentencing is scheduled for October 1, 2024.

time and with each new criminal act.  As part of their *modus operandi*, the Defendant and his co-conspirators deliberately targeted South Asian jewelry stores because these stores often sold a higher purity in gold, which equated to more cash in their pockets.  The co-conspirators researched such stores to select their targets before meeting in Washington, D.C. (hereafter, "D.C.") and traveling in one or more "getaway" vehicles to the location of their chosen victim.  To evade law enforcement detection, some of the suspect vehicles were stolen and/or outfitted with stolen tags.

The co-conspirators, who often "cased" the store in advance of the robbery, sometimes employed tactics, such as wearing religious garb to fit in with customers, to gain access to the store and take its occupants off-guard.  At other times, they used sledgehammers to destroy the store's door or windows and gain entry.  On each occasion, however, multiple co-conspirators stormed the store in a show of force, wearing dark clothing, masks, and gloves to conceal their identities, with at least one co-conspirator armed with a firearm to act as "crowd control" and ensure compliance from employees and customers.  The co-conspirators then used hammers to smash the glass display cases, filling bags with gold jewelry and resulting in significant damage throughout the stores.  Most concerningly, in every single instance, the Defendant and his co-conspirators terrorized the store's owners, employees, and/or customers by engaging in an armed takeover of the store and then ransacking it before fleeing.

On or about April 25, 2023, a federal grand jury indicted two of the co-conspirators, Trevor Wright and William Hunter, on one count of Conspiracy to Interfere with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951, in relation to an armed robbery of Paradise Jewelry Store ("Paradise") [ECF No. 1].  On August 17, 2023, a federal grand jury returned a 19-count Superseding Indictment, charging the Defendant and his co-conspirators in connection with nine armed robberies in New Jersey, Pennsylvania, Florida, and Virginia, with substantial planning and

coordination occurring in D.C. [ECF No. 10].  On March 12, 2024, a Second Superseding Indictment was filed, adding charges related to two additional robberies, including one in D.C., as well as charges related to the recovery of firearms and narcotics from multiple residences associated with the co-conspirators, including the Defendant [ECF No. 134].

Specifically, the Defendant was arrested on August 30, 2023, and a residence associated with him was searched pursuant to a judicially authorized warrant.  During the search, law enforcement recovered two firearms, as depicted in Figure A below: 1) a Glock 23 .40 caliber pistol, equipped with a machinegun conversion device; and 2) an AK-Style 7.62 x 39mm rifle. DNA testing for both firearms revealed that the Defendant's DNA profile was included in the profiles from both firearms.



*Figure A: firearms recovered from 1402 Euclid St. NW on August 30, 2023*

On May 30, 2024, pursuant to a plea agreement [ECF No. 162], the Defendant plead guilty to a two-count Superseding Information, charging Conspiracy to Interfere with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951 (Count One), and Possession of a Firearm in Furtherance of Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two) [ECF No. 153].  In so doing, the Defendant accepted responsibility for his involvement in the following four armed robberies, detailed further *infra*:  (1) the November 10, 2022 armed robbery

of Baral Jewelers and Gift Center in Harrisburg, Pennsylvania; (2) the November 27, 2022 armed robbery of Sara Jewelry in Jersey City, New Jersey; (3) the December 22, 2022 armed robbery of Chintamanis Inc. in Franklin Park, New Jersey; and (4) the August 4, 2023 armed robbery of Jolie Jewelry in D.C.

  i. <u>November 10, 2022 Armed Robbery of Baral Jewelers (Harrisburg, PA)</u>

On November 10, 2022, at around 6:30 p.m., the Defendant and several co-conspirators, including William Hunter, Franklin Hunter, Robert Sheffield and Andrew Smith, committed an armed robbery of Baral Jewelers and Gift Center (hereafter, "Baral") in Harrisburg, Pennsylvania, robbing the store of an estimated $1,000,000.00 in gold jewelry. Prior to the robbery, the Defendant and his co-conspirators traveled from D.C. to the store in two suspect vehicles. After arriving, at least two co-conspirators remained in the vehicles, which were parked in front of the store, to act as "getaway" drivers, while several others, including the Defendant, rushed into the store. Two armed co-conspirators remained in the front of Baral, a grocery area, subduing the employees and customers there as four others, including the Defendant, ran to the rear where the gold jewelry was housed.

As employees and customers in the front of the store cowered in terror, covering their faces or ears, one of the gunmen stalked towards the cash register, holding the store owner at gunpoint and taking approximately $600 from the cash register. Meanwhile, one of the four suspects in the rear of the store used a firearm to coerce an employee to the ground as the Defendant and two others smashed the glass display cases and shoveled gold jewelry into large bags. Screen shots taken from surveillance video, which recorded the front and rear areas of Baral during the robbery, are depicted in Figure B below:

4



*Figure B: screenshots taken from surveillance video of Baral armed robbery*

Once satisfied with their loot, the Defendant and his co-conspirators ran back through the front grocery area, kicking over a box of produce before fleeing the scene in the two suspect vehicles. As noted above, the Defendant and his co-conspirators robbed Baral of an estimated $1,000,000.00 in gold jewelry. In appallingly brazen displays following the robbery, the Defendant and some of his co-conspirators posted social media videos of themselves partying at a nightclub in D.C. that same night. Six days later, a co-defendant posted an Instagram story showing the Defendant and co-conspirators in a car flaunting their newfound cash, as depicted in

Figure C below:



***Figure C: screenshot taken from Instagram Story posted to @blufrank Instagram account***

    ii.    <u>November 27, 2022 Armed Robbery of Sara Jewelry (Jersey City, NJ)</u>

Little more than two weeks later, on November 27, 2022, at around 4:30 p.m., the Defendant and at least four co-conspirators, including William Hunter, Franklin Hunter, and Andrew Smith, committed another armed robbery, this time at Sara Jewelry (hereafter, "Sara") in Jersey City, New Jersey. The Defendant and his co-conspirators traveled from D.C. to Sara in two suspect vehicles, both outfitted with stolen tags. Upon arriving at Sara, the Defendant and four co-conspirators ran from the suspect vehicles and pushed their way into the store as a customer and his family were entering. Once inside, in just 90 seconds, the Defendant and his co-conspirators stole over $400,000.00 in gold jewelry.

After entering the store, the Defendant and his co-conspirators, who wore black clothing, masks and gloves, ordered everyone to the ground as they smashed the glass display cases and shoveled gold jewelry into bags. During the robbery, one of the co-conspirators pointed a handgun

6

at an employee and ordered her to "open the safe or I will shoot you."[2] The employee, who was unable to open the safe, started praying before one of the suspects pushed her to the ground and took a nearby bag containing $20.00 in currency. The Defendant and co-conspirators then fled from the store into the two suspect vehicles, which sped back towards D.C. One day after the robbery, William Hunter sent Trevor Wright the image depicted in Figure D below, which appears to be a black plastic bag containing numerous gold bangles similar to those taken from Sara Jewelry:



***Figure D: image sent from William Hunter to Trevor Wright on November 28, 2022***

    iii.    <u>December 22, 2022 Armed Robbery of Chintamanis Inc. (Franklin Park, NJ)</u>

Less than a month later, on December 22, 2022, at around 5:40 p.m., the Defendant and at least six co-conspirators, including Franklin Hunter, committed an armed robbery of Chintamanis Inc. (hereafter, "Chintamanis") in Franklin Park, New Jersey. They traveled from D.C. to the jewelry store in two suspect vehicles, including a Dodge Charger. After arriving at Chintamanis, the Defendant and his co-conspirators entered the store by shattering the front door with a sledgehammer, as depicted in Figure E below:

---

[2] The United States has insufficient information to determine whether the Defendant was the armed suspect.



*Figure E: screenshot taken from surveillance of Chintamanis armed robbery*

After brazenly smashing the front door, the co-conspirators, who wore dark clothing, masks and gloves and carried bags, hammers, and at least one firearm with an extended magazine, piled inside, where they smashed the glass display cases and pillaged the store of its gold jewelry. After one of the store owners attempted to flee, one of the co-conspirators grabbed her and held her down, occasionally dragging her on the ground, as depicted in Figure F below:



*Figure F: screenshot taken from surveillance of Chintamanis armed robbery*

Another co-conspirator, gun in hand, pursued two other store employees who were also attempting to flee. The armed co-conspirator ultimately grabbed one employee, pressing the barrel of the gun against the employee's temple and forcing him to the safe, where he demanded that the employee open it, as depicted in Figure G below:[3]



*Figure G: screenshot taken from surveillance of Chintamanis armed robbery*

Overall, the co-conspirators stole an estimated $400,000.00 in gold jewelry from Chintamanis. Unsatisfied with just the gold, however, the co-conspirators also stole a phone and a wallet from store employees before fleeing into the suspect vehicles and away from the scene. The harm caused by the Defendant and his co-conspirators that day did not end there, however, and the damaging consequences of their actions continued even after they fled the store.

After the co-conspirators fled from Chintamanis with the stolen gold jewelry, Franklin Hunter was driving the black Dodge Charger. According to DNA obtained from inside the vehicle, the Defendant, Joshua Matthews, and another co-conspirator were also inside. Tragically, during

---

[3] Based on its evidence, the United States does not believe the Defendant was one of the armed co-conspirators during this robbery.

the co-conspirators' high-speed flight, the Dodge Charger collided into another vehicle, killing Joshua Matthews. After the collision and before law enforcement arrived, the Defendant, Franklin Hunter, and the other co-conspirator piled into the other suspect vehicle. The co-conspirators then drove away, leaving Matthews in the backseat of the Dodge Charger, where he was found deceased by police, wearing black clothing and a ski mask. As depicted in Figure H below, the wrecked Dodge Charger was recovered; inside were two loaded firearms, a hammer, a duffel bag used to carry the stolen gold, and some jewelry from Chintamanis:



\

*Figure H: Dodge Charger after recovery*

   iv. *August 4, 2023 Armed Robbery of Jolie Jewelers (Washington, D.C.)*

Wholly undeterred by the horrific circumstances leading to the death of Joshua Matthews, on August 4, 2023, at around 3:30 p.m., the Defendant and at least four co-conspirators, including Franklin Hunter, committed yet another armed robbery, this time at Jolie Jewelers ("Jolie") in Washington, D.C.  Once again using stolen cars, the Defendant and his co-conspirators arrived at the store location, where the Defendant remained in one of the suspect vehicles parked nearby to serve as a lookout.

The co-conspirators entered the store through a ruse, with one co-conspirator dressed in a UPS uniform, appearing as if he had a delivery for the store.  After an employee buzzed him in, he held the door open to allow three other co-conspirators to enter before acting as a lookout and preventing anyone from leaving the store during the robbery.  During the robbery, employees and customers held onto one another, cowering in fear on the floor while one co-conspirator brandished a firearm, another smashed display cases with a hammer, and a third assisted in shoveling gold jewelry into a bag, as depicted in Figure I below.



*Figure I: screenshot taken from surveillance of Jolie armed robbery*

Ultimately, the Defendant and his co-conspirators robbed Jolie of jewelry with an approximate estimated value of $150,000.00 before fleeing the scene.

## II. LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

The listed factors in 18 U.S.C. § 3553(a) include the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –
   a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b) To afford adequate deterrence to criminal conduct;
   c) To protect the public from further crimes of the defendant; and
   d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for –
   a) The applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
      i) Issued by the Sentencing Commission . . . ; and
      ii) That . . . are in effect on the date the defendant is sentenced

5) Any pertinent policy statement –
   a) Issued by the Sentencing Commission . . . and
   b) That . . . is in effect on the date the defendant is sentenced

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

Procedurally, after calculating the applicable Guidelines range, the Court should next consider all the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

### III.  GUIDELINES CALCULATION

#### A.  Total Offense Level

With respect to Count One, the base offense level for a violation of 18 U.S.C. § 1951 is governed by U.S.S.G. § 2B3.1. As detailed in the Final Presentence Report (the "PSR") [ECF No. 212] and the plea agreement [ECF No. 162], the aggregate offense level for Count One is 33, pursuant to U.S.S.G. § 3D1.4. After adjustments for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b), the final offense level for Count One is 30. As to Count Two, the applicable guideline sentence for a violation of 18 U.S.C. § 924(c)(1)(A)(i) is governed by U.S.S.G. § 2K2.4(b).

#### B.  Criminal History Category

The PSR writer calculates the defendant to have a total of 2 criminal history points, which places him in Criminal History Category II. *See* PSR ¶ 119.

#### C.  Sentencing Guideline Range

For Count One, a final offense level of 30 and Criminal History Category II results in a

guidelines range of 108 to 135 months of incarceration, 1-3 years of supervised release, and a fine range of $30,000 to $250,000. *See* U.S.S.G. §§ 5D1.2(a)(2) and 5E1.2(c)(3). Pursuant to U.S.S.G. § 2K2.4(b), the guidelines range for Count Two is the minimum term of imprisonment set by statute, here, sixty months of incarceration, which shall be imposed consecutively to the sentence imposed on Count One, and 2-5 years of supervised release. As a result, the Defendant's aggregate sentencing range for Counts One and Two is 168 to 195 months of incarceration.

## IV. ARGUMENT

As stated above, the United States respectfully requests that the Court sentence the Defendant to a term of 168 months of incarceration, followed by 60 months of supervised release. As part of its plea agreement, the United States agreed to cap allocution at the bottom of the applicable guidelines. The United States respectfully submits that a sentence of 168 months is sufficient, but not greater than necessary, to serve the interests of justice and appropriately balances the sentencing factors under 18 U.S.C. § 3553(a).

### 1. The Nature, Circumstances, and Seriousness of the Offense

The seriousness of the Defendant's offenses and the resulting harm cannot be overstated. The Defendant was part of a carefully coordinated scheme to ransack and rob primarily minority-owned establishments using firearms and hammers. This conspiracy, lasting over a year, involved *at least* fifteen co-conspirators, deliberately spanned multiple jurisdictions to evade law enforcement detection, and was ultimately only brought to a halt by the apprehension of the co-conspirators.

Nor did the Defendant and his co-conspirators have any regard for the victims they terrorized, victims who experienced the nightmare of being swarmed by masked strangers pointing firearms at them. The danger inherent in any robbery involving loaded firearms is self-evident,

14

and the circumstances here reflect that danger. Indeed, some of these victims felt the press of a gun barrel against their temple or were held at gunpoint. Others suffered the indignities of being manhandled, shoved to the ground, thrown out a door, or forced to a safe at gunpoint. The Defendant and his co-conspirators ravaged the stores they robbed, spraying the stores with shards of glass and turning the victims' place of work into a chaotic crime scene. And tragically, some of the victims did not have insurance to absorb the significant losses they suffered at the hands of the Defendant and his accomplices. Moreover, as illustrated by the death of Joshua Matthews after the Chintamanis robbery, the high-speed flight after each robbery further endangered the community, including the perpetrators themselves. Put simply, the actions of the Defendant and his co-conspirators resulted in significant and lasting harm to many.

To his credit, the United States does not consider the Defendant to have been a leader or organizer of the overarching scheme. Even so, the Defendant's conduct over an extended period of time demonstrates a willingness to inflict violence upon others for monetary and/or proprietary gain, as well as a complete disregard for the consequences. As a result, based on the nature and circumstances of the offense, the United States' recommended sentence is warranted.

2. **The Defendant's History and Characteristics**

In requesting a sentence at the bottom of the Defendant's sentencing guidelines range, the United States credits his early acceptance of responsibility. Nor does the United States overlook the impact of the Defendant's difficult childhood and personal circumstances, as detailed in the PSR. *See* PSR at 33-37. The PSR, however, also details his criminal history, which dates back nearly two decades and includes prior illegal firearms possession, as well as conduct similar in nature to the offenses at issue here.

Given that the offenses the Defendant committed here represent an escalation, it appears

15

that the Defendant may have been emboldened by past contacts with the legal system that failed to result in any meaningful consequences. Indeed, it is noteworthy that the Defendant committed three of the armed robberies (Baral, Sara, and Chintamanis) while on supervision in D.C. Superior Court Case 2020-CF2-009408, a firearms possession case. *See* PSR at 26. In sum, the Defendant's criminal history, his possession of two firearms at the time of his arrest, and the repeated nature of the Defendant's conduct support the substantial sentence requested by the United States.

### 3. The Need to Promote Respect for the Law and Deterrence

As called for by the statute, the sentence should reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). Perhaps more than any other factor, the need to deter the calculated and violent conduct in this case weighs most heavily in favor of the recommended sentence. The Defendant and his co-conspirators used social media after the robberies to glorify their ability to swiftly acquire substantial amounts of money—they were not shy about exhibiting and promoting the extravagant lifestyle that followed. Of course, the stacks of cash they flaunted were not theirs to spend. The Defendant, his co-conspirators, and anyone who admired their lifestyle should understand that their actions have consequences, and the severity of those consequences render such schemes unworthwhile.

A prison sentence of 168 months is the best measure of deterrence available to the Court. Such a sentence accomplishes the aims of § 3553(a)(2) in both a general and particularized manner. As applied to the Defendant, such a sentence reflects both the seriousness and dangerousness of the Defendant's conduct in this case. With respect to general deterrence, this recommended sentence promotes respect for the law and the safety of the community by serving as a deterrent to

brazen and violent conduct such as that perpetrated by the Defendant and his co-conspirators in this case.

### 4. Other factors

The United States' recommended sentence is also justified to protect the public from the Defendant, who carried out his violent conduct not over the course of days or even weeks, but over an extended period of time, nearly up until his arrest in this case. It would also give the Defendant ample time to pursue further educational and vocational training and participate in other programs that will hopefully stop his trend towards escalating violence and recidivism in its tracks. The recommended sentence also appropriately reflects that the Defendant's encounters with the criminal justice system have, to date, not adequately deterred him from engaging in the conduct to which he ultimately pleaded guilty in the present case.

### V. CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the Defendant to 168 months of imprisonment, followed by a term of 60 months of supervised release. Such a sentence serves the interest of justice and appropriately balances the sentencing factors articulated under 18 U.S.C. § 3553(a).

    Respectfully submitted,

    MATTHEW M. GRAVES
    UNITED STATES ATTORNEY
    D.C. Bar No. 481052

By:    */s/ Sitara Witanachchi*
    SITARA WITANACHCHI
    D.C. Bar No. 1023007
    ANDREA DUVALL
    AR Bar No. 2013114
    Assistant United States Attorneys
    U.S. Attorney's Office
    Violence Reduction & Trafficking Offenses
    601 D Street, NW
    Washington, D.C. 20530

## CERTIFICATE OF SERVICE

    I hereby certify that on September 24, 2024, a copy of the United States' Sentencing Memorandum was submitted via CM/ECF, which will transmit to counsel to the Defendant, Mr. Mark Rollins, Esq.

                                                     */s/ Sitara Witanachchi*
                                                     Assistant U.S. Attorney